*Court of Common Pleas, Dauphin County, November 15th,* 1858.

SMULLER ET AL. *v.* WILSON ET AL.

When property has been levied upon and extended at a fixed rental, this does not prevent a subsequent lien creditor without actual notice from issuing execution; but if the property is not condemned, he must pay the costs; if it is, it can be sold. The fact that the matter was pending in court is not a sufficient notice.

BY THE COURT.—This case comes before the court on a motion to confirm an inquisition and condemnation of the defendants'

[Smuller et al. *v.* Wilson et al.]

real estate held under a *fieri facias* issued by the plaintiff. From the record it appears that numerous judgments existed against the defendants in favor of various plaintiffs, one of whom issued a *fi. fa.* to April Term, 1858, levied on the same real estate taken in execution on the above stated *fi. fa.;* the property was extended at a fixed rental, and after notice retained by the defendants under the act of 1840. The plaintiffs' judgment had previously been entered on the records of this county, and it is assumed by the defendants that no new inquisition can lawfully be held, but that the former extent is conclusive on the plaintiffs, who must proceed to collect their debt by receiving the half yearly rental fixed by the jury, according to the method prescribed by the act of the 26th of April, 1855, which provides in substance, that in all cases of *inquisition and extent* of real estate, and acceptance thereof by the defendant under the act of the 13th of October, 1840, said act shall be construed not to permit any second or other *inquisition and extent*, pending the first, upon any writ issued upon a judgment entered in the court of the proper county at the date of the inquisition; but the plaintiff claiming to have a lien must proceed to collect the same in the manner provided under the fourth section of the former act, to wit: by receiving the half yearly rental at the time entitled, according to the priority of the liens. The case under consideration is not one of *inquisition and extent*, but a *condemnation* of the property by the sheriff's jury; therefore it does not come within the letter of the act. Is it within the spirit and meaning? As the law stood prior to the act of 1855, each judgment creditor might have an inquisition held on the property of his debtor, although the same had been previously extended, as he might, at his option, take the rental after a decree of distribution on the *fi. fa.* of another creditor. Where many judgments existed, and each creditor caused an inquest to be held, and numerous extensions took place, the rentals would be as variant as the opinion of different juries as to the annual value of the property, consequently great confusion would follow in distributing the proceeds. One would take according to the rental fixed by one jury, and others at a different rate, each being bound by the inquest caused to be held by himself, or in which he had participated. The courts held that no one was bound by a proceeding unless he was a party thereto, as the law had not required notice to be given of the time and place of holding the inquisition to any but the debtor. The legislature in passing the act under consideration doubtless had in view the avoidance of the confusion incident to extensions at different rentals, and probably also desired to prevent the increase of costs; at the same time we can scarcely believe that they designed to bind creditors by the action of others without requiring notice.

The plainest dictates of natural justice forbids that any man

[Smuller et al. *v.* Wilson et al.]

should be affected in his interest by any judicial decision without notice, and being authorized to participate therein. We must so construe this law as to do the least possible injury and prevent injustice; and this, in our opinion, is best effected by adhering to the letter—permitting a plaintiff who never participated in the former proceeding to hold a new inquest at his peril. If the property condemns, it does not come within the inhibition of the statute, and the inquisition is lawful. If it extends it is within the letter of the act, is unlawful, and the plaintiff must pay the costs of the experiment. We are aware that this course of reasoning makes the legality of the proceeding dependent on the result of the finding; but such apparent incongruities will sometimes arise in construing imperfectly framed statutes. Any other construction would enable a creditor friendly to the interest of his judgment debtor, without notice to other lien creditors, by a dishonest contrivance, to have the property extended at a rental, when it should have been sold for the payment of debts, and thus delay all other creditors then having liens, whose first notice of the proceeding might be in the form of an objection on the part of the debtor, to their holding any new inquisition on his estate. The evil is illustrated by the present case. Here it is conceded that a mortgage of considerable amount was, by neglect or oversight, omitted to be laid before the inquest, which was returned confirmed, and the annual rental ordered to be distributed; and it does not appear that the present plaintiff, or any other judgment creditor had notice of the proceeding, except so far as may be inferred by the principle of *lis pendens*, which has been held in most cases inapplicable to Pennsylvania, being for the most part constructive notice contrary to the fact.

The law did not, however, require that the lien creditors should be notified, as it presumes that every inquest will fix a fair rental, or if the rate is too high or low the variance from a proper sum must necessarily be small, and the maxim of *de minimis* will apply; a new "*inquest and extent*" is in such cases prohibited. But when it is shown that the property should have been condemned and the creditor entitled to sell it for the realization of his debt, it becomes to him a matter of moment. If the legislature intended to bind him in such a case, we must believe that notice to all the lien creditors of the time and place of holding the inquisition would have been prescribed, and without that they ought not to be bound by the *ex parte* action of the jury. By the finding of the last inquest it clearly appears that the present plaintiffs were wronged by the action of the former jury, in which they had in no wise participated, and of whose decision they had good ground to complain, if binding on them. We are of the opinion that the inquisition can be lawfully confirmed, it having condemned the estate, and therefore grant the plaintiff's application.

*Court of Common Pleas, Dauphin County, July 3d, 1858.*

## HOCKER *v.* BASKINS, EXECUTOR OF WOODS.

When one of two guardians has been discharged by the Orphans' Court, the other afterwards becomes insolvent, and the person who had gone bail for both of them pays the money due by the latter to his ward, the surety cannot demand the amount paid from the discharged guardian.

BY THE COURT.—From the facts submitted, it appears that Henry Woods and John Strasbaugh were appointed guardians of Timothy Kirby's minor children on the 21st of November, 1845, and gave bond in $7000 for the faithful performance of their duty, with Peter Hocker as security. On the 27th day of April, 1846, Henry Woods presented his petition to the Orphans' Court setting forth that no money had come into his hands belonging to their wards, and asking to be discharged from his appointment as guardian. On the same day, Peter Hocker was appointed in his stead, and directed to give security in $7000, and Wood was discharged, and "ordered to deliver over to the guardian then appointed all goods, moneys, effects, and papers belonging to his said wards, if any he has." On the 2d of May, 1846, Peter Hocker declined accepting the appointment. In August, 1846, John Seales was appointed for one of the minors. Henry Woods died on February 7th, 1847. In April, 1855, John Strasburgh died insolvent, and Peter Hocker took out letters of administration on his estate, settled an account as guardian of said minors, and a balance was found due them from John Strasbaugh of $1838.07, which sum was voluntarily paid by Hocker as bail of Strasbaugh. Three questions present themselves for our consideration. First, was the payment by Hocker voluntary, or could he have been obliged to pay, if sued on the bond? Second, did the discharge of Woods as guardian, under the circumstances, release him from all liability, or did the same stand as security for the faithful performance of Strasbaugh? And third, if the bond remains in full force against Wood's estate, should he be treated as principal and obliged to indemnify Hocker, or as a co-surety and bound to contribute? The first point is one of some nicety, which we are relieved from deciding, as, in our opinion, the second is decisive of the case. It may be observed in regard to the first, that if it were a private transaction, there could be no doubt as to the effect of Henry Woods' discharge. The release of one obligor discharges all, or any interference with the parties designated to perform the duties, by which one is relieved and additional burdens thrown upon the other, discharges the surety. Peter Hocker might have been perfectly willing to stand as bail for Woods and Strasbaugh, knowing that the former was responsible, honest, and careful, yet entirely unwilling to be held for Strasbaugh alone.

How far the action of a court, in the exercise of its legal discretion, may have that effect, is a point by nó means clear, and so far as we have been able to discover, the decisions are contradictory. It is very certain that a surety cannot be rendered responsible beyond the letter of his obligation by the action of any court.

Second. The decree of the court discharging Henry Woods as guardian, and the appointment of Hocker, ordering new bail to be given in the sum of $7000, in our opinion not only releases him from performing any further duties as guardian, but absolves him from all liability for the acts of his co-guardian. It was not the intention to discharge him in part, but in whole. The court did not design to "keep the promise to the ear, and break it to the hope" of this old man, but to release him entirely, and have new bail entered in a like sum. Of course, the bail bond would stand as security for the faithful appropriation of all money which had *then* come into the hands of either of the guardians; but it was conceded on the argument, and made part of case stated, that they had not at that time received anything. It therefore ceased to be obligatory on Henry Woods as to any money which Strasbaugh might receive afterwards.

*Alricks and Fisher, for plaintiff.*

*Alricks, for defendant.*